Filed 3/14/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| TERENCE SCHOSHINSKI et al., | B269431 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC459269) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Elihu M. Berle, Judge. Affirmed.

Marlin & Saltzman, Stanley D. Saltzman, Stephen P. O'Dell; The Hamideh Firm and Bassil A. Hamideh for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Thomas Peters, Chief Assistant City Attorney, A. Patricia Ursea, Deputy City Attorney, for Defendant and Respondent.

———————————————

In 2012, the City of Los Angeles settled *Chakhalyan v. City of Los Angeles* (*Chakhalyan*), a class action lawsuit. The suit alleged the City had an unlawful practice of charging a trash disposal fee to customers living in multi-unit dwellings who received no trash disposal services from the City. *Cunningham v. City of Los Angeles*, another class action lawsuit asserting similar allegations, was simultaneously pending. The named plaintiff, Brian Cunningham, did not opt out of the *Chakhalyan* class or exclude himself from the settlement. Following approval and finalization of the settlement in *Chakhalyan*, the City successfully moved for summary judgment of Cunningham's claims. However, the trial court permitted Cunningham to amend the complaint to add two additional named plaintiffs.

The two new plaintiffs, Terence Schoshinski and Thomas Ballatore (collectively "plaintiffs"), also alleged the City unlawfully charged them and others the trash disposal fee. The City again moved for summary judgment, offering evidence that in connection with an injunctive relief provision in the *Chakhalyan* settlement, the City had already reimbursed the plaintiffs for all improper charges. The City argued plaintiffs' claims were now moot and they lacked standing to prosecute the action. The trial court agreed and granted summary judgment.

On appeal, plaintiffs argue the trial court erred in concluding they could not continue representing the class defined in their complaint. Plaintiffs assert their individual claims are not moot because they did not receive all of the relief they demanded in their complaint. They also rely on caselaw indicating a defendant's attempts to unilaterally resolve a class representative's claims, or "pick off" the representative, do not

2

necessarily eliminate that plaintiff's standing to continue prosecuting claims alleged in a class action complaint.

We conclude plaintiffs' individual claims are moot because a court could grant them no further relief beyond what they have already received. Further, unlike other cases in which the "pick off" exception has been applied, here, the injunctive relief provisions in the *Chakhalyan* stipulated settlement and judgment required the City to reimburse plaintiffs and other putative class members. The City complied with this obligation before plaintiffs filed the second amended complaint naming them as parties. Under these particular circumstances, the "pick off" exception does not apply.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2010, Lilith Chakhalyan filed a class action lawsuit against the City of Los Angeles alleging it improperly collected "solid resource fees" from her and other class members, through entities such as the Department of Water and Power (DWP) and the Department of Public Works. Chakhalyan claimed the City "was improperly billing and collecting Solid Resource Fees . . . from herself and others who live in Multiple-Family Dwellings (e.g. apartment buildings). Plaintiff claimed that the [fee] collected from her was illegal because the City is prohibited from collecting [the fees] from Multiple-Family Dwellings . . . if the City does not collect trash from the building."

In April 2011, Brian Cunningham filed a separate class action suit against the City and various entities (collectively "the City"), alleging the City had improperly charged him and others the solid resource fee. According to the complaint, in 2001, the City settled a lawsuit regarding a fee improperly imposed for

3

trash collection services, yet it continued unlawfully charging the same fee under a different name.

On June 8, 2012, the trial court conducted a final approval hearing, and on June 25, the court entered a final order and judgment in *Chakhalyan*. The judgment adopted the terms and conditions of a settlement agreement the parties had entered and executed in December 2011. The judgment finally certified a class defined as "all customers of the Los Angeles Department of Water & Power who, between October 28, 2007 and February 27, 2012, inclusive, paid [a solid resource fee] Overcharge and who did not exclude themselves from the Class."[1]

Under the settlement, all class members were entitled to full reimbursement of all solid resource fee overcharges paid from October 28, 2007 through February 27, 2012.[2] The City was to pay all class member claims no later than 180 days after entry of the final order and judgment; thus, by approximately late December 2012.

---

[1] The agreement defined solid resource fee "overcharges" as "the [solid resource fee] charged to residents of Multiple-Family Dwellings who should not have been charged [a solid resource fee] at all and/or who should have been charged [solid resource fee] at the lower Multiple-Family Dwelling rate instead of at the higher single-family dwelling rate."

[2] The settlement created two categories of class members, "identified class members" and "self identified class members." Identified class members were to be reimbursed without any action on their part. Self-identified class members were required to submit a claim within 90 days after the final approval hearing.

4

The settlement, incorporated into the judgment, also provided for injunctive relief.  This included the following: "(1) The City will alter its billing system, policies and practices to ensure that the [solid resource fee] Overcharges are halted and do not recur.  These alterations have or will include the actions set forth in Exhibit G.  (2) The City will routinely monitor its billing system, policies and practices to ensure that the [solid resource fee] Overcharges do not recur.  In the event it identifies future [solid resource fee] Overcharges through such monitoring, the City will promptly and fully reimburse any persons so identified according to the City's refund policy and make further appropriate modifications to its billing system, policies and practices."

Exhibit G, referenced in the agreement, included measures such as a billing insert to be sent to all new residential customers explaining Bureau of Sanitation rates; the posting of notices regarding refunds or credits for solid resource fee overcharges in DWP offices and on the DWP website; and ongoing Bureau of Sanitation projects related to preventing and correcting billing errors.[3]

---

[3]  Of particular note here are three measures listed on Exhibit G: "No. 5: The Solid Resources Fee (SRF) on residential accounts that are newly initiated will be determined by BOS [Bureau of Sanitation].  BOS will staff a desk at DWP to work alongside DWP staff to ensure accurate SRF Code determinations.  The DWP will provide electronic confirmation of data file changes and provide exception reports to the BOS on a monthly basis and correct billing errors within four weeks of receipt."  "No. 10: IT staff from BOS are developing an automated program to check DWP account data (monthly download data) against correction data files sent by BOS to DWP, to assure

The judgment additionally provided: "Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over (a) implementation of the settlement and any award or distribution to the Class Members, including any dispute regarding an individual's entitlement to receive a settlement benefit or its amount; and (b) all Parties for the purpose of enforcing or administering the Stipulation, pursuant to C.C.P. § 664.6 or otherwise."

In December 2012, the City filed a motion for summary judgment in *Cunningham*. Plaintiffs' opposition to the motion, filed on February 21, 2013, included a declaration from Terence Schoshinski. Schoshinksi declared he had been charged, had paid, and continued to pay the solid resource fee, despite not receiving trash pick-up services from the City for his multi-unit residential property. Schoshinski declared he had repeatedly contacted the City and requested that it cease charging him the fee, to no avail.

On March 8, 2013, the City issued an over $980 credit to Schoshinski's DWP account.

On April 9, 2013, Cunningham's counsel provided the City's counsel a copy of a proposed Second Amended Complaint, which named Schoshinksi and Ballatore as plaintiffs.

On April 16, 2013, the City issued an over $1500 credit to Ballatore's DWP account.

---

errors remain corrected and fix any that reappear as soon as possible." "No. 11: A dedicated Database Architect will be assigned to monitor the automated program for checking the status of corrected data files against the DWP account data subject to Mayoral and Council approval."

On April 18, 2013, Cunningham filed an ex parte application asking the court to specially set a hearing on his motion for leave to file a second amended complaint so that it could be considered before or with the City's motion for summary judgment.

On April 29, 2013, the trial court granted summary judgment in favor of the City on Cunningham's complaint. The court concluded the City "offered sufficient evidence to show [Cunningham's] claims are precluded based upon the valid and binding *Chakhalyan* settlement and the doctrines/defense of res judicata and lack of standing. [Cunningham] presented no evidence to raise a triable issue of material fact." However, the court granted Cunningham leave to file the second amended complaint adding Schoshinski and Ballatore as plaintiffs. According to plaintiffs, on that day, after the court hearing, they learned for the first time that the City had credited their accounts for the overcharges they had paid.

On April 30, 2013, plaintiffs filed the second amended complaint.

In June 2013, the City again moved for summary judgment. The City argued res judicata barred Ballatore from pursuing some of his claims because he was a class member in the *Chakhalyan* suit. The City further asserted both plaintiffs lacked standing because their claims were moot. According to the City, the *Chakhalyan* settlement resulted in a "continuing injunction within the court's jurisdiction, prohibiting and redressing the very conduct of which Plaintiffs complain in this lawsuit and about which they might claim any standing . . . ." The City further argued: "By virtue of these mandatory injunctive obligations, the City is required to provide prospective relief to all

7

individuals it discovers have been mischarged [solid resource fee] Overcharges, in addition to ceasing the billing of those charges. On this basis, Plaintiffs and 852 others have already obtained relief regarding SRF Overcharges and Plaintiffs cannot obtain any effectual relief, or relief that would not just duplicate the already mandatory *Chakhalyan* obligations."

In support of the motion, the City offered declarations from several City employees. A City database architect declared: "Since conclusion of administration of refunds/credits to self-identified and identified *Chakhalyan* class members, in the course of my duties as a Database Architect for the Bureau [of Sanitation], I continue to review and determine whether there are any accounts that need adjustment (i.e. the stopping and/or refunds/credits of Solid Resource Fees). I do so consistent with the injunctive obligations on the City pursuant to *Chakhalyan.* [¶] To this end, since January 2013, I am aware of 854 such accounts for which such adjustments were made, including the accounts of Thomas Ballatore and Terence Schoshinski . . . ." The declaration was dated June 11, 2013.

Another City employee declared billing records indicated Ballatore paid the solid resource fee from September 11, 2007 through April 10, 2013; the charges were stopped effective April 16, 2013, and the City issued a refund/credit on that date for all of the solid resource fee charges Ballatore paid from October 2009 through April 10, 2013. The employee similarly declared billing records showed the City stopped charging Schoshinksi the solid resource fee effective February 26, 2013, and it issued him a refund/credit on March 8, 2013. The declaration concluded: "Tom Ballatore and Terence Schoshinksi received the

8

aforementioned refunds/credits pursuant to the injunctive obligations arising from *Chakhalyan v. City of Los Angeles . . . .*"

The City also offered the declaration of an employee who, in addition to supervising tasks related to claims review for *Chakhalyan* class members, "supervise[s] and/or oversee[s] compliance with the injunctive obligations on the city as a result of" *Chakhalyan.* The employee declared: "Consistent with the pending injunction, 854 customer accounts, including those of Thomas Ballatore and Terence Schoshinksi, have had Solid Resources Fee charges stopped and refunds/credits issued."

The parties stipulated to narrow the issues presented for summary judgment to the City's assertion that the plaintiffs' claims were moot and they therefore lacked standing since, prior to joining the action, they obtained relief pursuant to the *Chakhalyan* injunction.[4]

Plaintiffs opposed the motion, on these narrowed grounds. Ballatore declared he began receiving private trash collection services in October 2009. According to Ballatore, the City told him in 2009 that he had to pay the solid resource fee, even though he was not receiving trash collection services from the City. He declared that in 2011, the City again told him he had to pay the fee, even after he called in response to a City letter informing residents they should not be charged a solid resource fee if they lived in a multiple-family dwelling that did not receive refuse collection services from the City. Ballatore declared that when he received a notice regarding the *Chakhalyan* settlement

---

[4]     The parties also stipulated that all of Ballatore's claims would be based on the City's actions subsequent to February 27, 2012; in other words, after the close of the *Chakhalyan* class period.

he discarded it. The City charged him the solid resource fee as late as April 2013. The credit to his DWP account was applied without his knowledge or consent. It appeared on his June 2013 DWP account statement.[5]

Schoshinski declared he informed the City in August 2012 that he was using a private trash collection service for his five-unit multi-family dwelling. According to Schoshinski, the City did not stop charging him the sanitation fee. He did not learn until April 29, 2013 that the City had, without his knowledge, applied a credit to his DWP account.

Plaintiffs argued the City did not stop charging them the solid resource fee, or attempt to refund the charges, until after it learned of their participation in the lawsuit. To support this claim, plaintiffs pointed to the timing of the refunds and plaintiffs' declarations indicating the refunds appeared on their accounts without explanation. They contended there was a triable issue of fact as to whether the City had engaged in an improper attempt to "pick off" plaintiffs to avoid class action litigation and class-wide liability.

The City stated as undisputed the fact that plaintiffs had received a refund for all solid resource fees they were improperly charged. Plaintiffs purported to dispute that fact with only the following statement: "It is unknown what the credit on [the

---

[5]     Plaintiffs attached a June 12, 2013 statement to Ballatore's declaration. The statement reflected electric charges from April 10, 2013 to June 10, 2013, and cancelled sanitation equipment charges. A prior DWP statement was also attached to the declaration. The prior statement was dated April 12, 2013. It reflected electric charges from February 9, 2013 to April 10, 2013, and a sanitation charge from February 9, 2013 to April 10, 2013.

10

plaintiffs' DWP accounts] was/is for or whether, if in fact it represents a refund, it is accurate."

The trial court granted the City's motion. The court reasoned, in part, that plaintiffs received refunds from the City after the *Chakhalyan* settlement was approved and this alone appeared sufficient to indicate they lacked standing to act as class representatives. The court rejected the "pick off" theory, noting the City's payments were mandatory under the *Chakhalyan* settlement, not voluntary. The court indicated plaintiffs offered no evidence to rebut the City's evidence showing the basis of the payments to them was the *Chakhalyan* settlement. The court concluded all of plaintiffs' claims were subsumed by that settlement and it provided all of the relief plaintiffs sought, thus plaintiffs had no valid claims.[6]

This appeal followed.[7]

---

[6] The trial court also invoked res judicata as a basis for its ruling. As noted above, the parties had stipulated to narrow the issues to mootness and standing; further, in the trial court, the City appeared to argue that only some of Ballatore's claims were barred by res judicata. As we resolve this case on other grounds, we need not consider the parties' arguments on appeal regarding res judicata.

[7] After the trial court issued an order granting the City's summary judgment motion, plaintiffs filed a notice of appeal. In August 2015, this court dismissed the appeal for lack of an appealable judgment or order. The trial court entered a judgment against plaintiffs in November 2015. This appeal timely followed.

11

## DISCUSSION

### I.    Plaintiffs' Claims Are Moot

Plaintiffs argue that despite the City's act of reimbursing them for the solid resource fee overcharges they paid, their individual claims are not moot because they have not received complete relief on their claims. They additionally contend that even if their individual claims are moot, the "pick off" exception to mootness applied, preserving their standing to continue prosecuting claims on behalf of others.

We disagree. The undisputed facts established plaintiffs' claims are moot and the "pick off" exception has no application under the circumstances presented here.

#### A.  Standard of Review

" 'Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. [Citation.]' [Citation.]" (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206.) Similarly, standing is a question of law we review de novo. (*IBM Personal Pension Plan v. City and County of San Francisco* (2005) 131 Cal.App.4th 1291, 1299.)

#### B.  Standing and Mootness in the Class Action Context

"In general, a named plaintiff must have standing to prosecute an action. . . . 'As a general principle, standing to

12

invoke the judicial process requires an actual justiciable controversy as to which the complainant has a real interest in the ultimate adjudication because he or she has either suffered or is about to suffer an injury of sufficient magnitude reasonably to assure that all of the relevant facts and issues will be adequately presented to the adjudicator. [Citations.] To have standing, a party must be beneficially interested in the controversy; that is, he or she must have "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large." [Citation.] The party must be able to demonstrate that he or she has some such beneficial interest that is concrete and actual, and not conjectural or hypothetical.' . . . 'Without standing, there is no actual or justiciable controversy, and courts will not entertain such cases. [Citation.]' [Citation.]" (*CashCall, Inc. v. Superior Court* (2008) 159 Cal.App.4th 273, 286.)

Related is the problem of "mootness." When a plaintiff has received all that he or she has demanded in the complaint, the case is considered "moot"; in other words, there is no further relief the court could provide. " 'Generally, courts decide only "actual controversies" which will result in a judgment that offers relief to the parties. [Citations.]' " (*Larner v. Los Angeles Doctors Hospital Associates, LP* (2008) 168 Cal.App.4th 1291, 1296 (*Larner*).)

"The pivotal question in determining if a case is moot is therefore whether the court can grant the plaintiff any effectual relief. [Citations.] If events have made such relief impracticable, the controversy has become 'overripe' and is therefore moot. [Citations.] [¶] Thus, ' "[m]ootness has been described as ' "the doctrine of standing set in a time frame: The requisite personal

interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).” ’ [Citations.]” ’ [Citations.]  When events render a case moot, the court, whether trial or appellate, should generally dismiss it.” (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1574; *United States Parole Comm’n. v. Geraghty* (1980) 445 U.S. 388, 396 (*Geraghty*).)

Because a class action suit involves potential relief to absent class members in addition to the plaintiff who brings the suit, courts have recognized the duty a named plaintiff owes to the class, and the “flexible character” of mootness in such actions. (*Geraghty, supra,* 445 U.S. at pp. 400-401; *La Sala v. American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 871 (*La Sala*).)  Thus, even when the named plaintiff’s claims are moot, courts have under some circumstances applied exceptions to the mootness doctrine to allow the plaintiff to continue prosecuting the suit. Plaintiffs invoke one such exception—the “pick off” exception— which we discuss at length below.

Still, the duty a plaintiff has to other class members “should not be confused with an additional *claim for relief*. A representative plaintiff still possesses only a single claim for relief—the plaintiff’s own.  That the plaintiff has undertaken to also sue ‘for the benefit of all’ does not mean that the plaintiff has somehow obtained a ‘class claim’ for relief that can be asserted independent of the plaintiff’s own claim.  ‘[T]he right of a litigant to employ [class action procedure] is a procedural right only, ancillary to the litigation of substantive claims.  Should these substantive claims become moot . . . , by settlement of all personal claims for example, the court retains no jurisdiction over the controversy of the individual plaintiffs.’ [Citation.]” (*Watkins*

14

*v. Wachovia Corp.* (2009) 172 Cal.App.4th 1576, 1589 (*Watkins*), quoting *Deposit Guaranty Nat. Bank v. Roper* (1980) 445 U.S. 326, 332 (*Roper*).)

Thus, we first consider whether plaintiffs' individual claims are moot.

### C. No Triable Issue of Fact that Plaintiffs' Individual Claims are Moot

Plaintiffs assert their claims are not moot because they have not received all of the relief they demanded in their complaint. We disagree.

#### i. The evidence established the City fully satisfied plaintiffs' monetary claims

The City offered evidence that plaintiffs' DWP accounts were credited for the solid resources fee overcharges plaintiffs had paid before plaintiffs joined the litigation. Plaintiffs offered no *evidence* to dispute the fact. They instead asserted they did not know what the credits were for, or if they were accurate. This was insufficient to raise a triable issue of fact on that point. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163 [responsive evidence giving rise to no more than mere speculation is insufficient to establish a triable issue of material fact].) Plaintiffs proffered no evidence indicating they are entitled to further monetary relief to be reimbursed for the solid resource fee overcharges they paid. Indeed, plaintiffs do not argue on appeal that they have not received all of the monetary relief they demanded in their complaint as to their individual claims.

15

### ii. The *Chakhalyan* judgment provides the injunctive relief plaintiffs seek in their complaint

The *Chakhalyan* settlement and judgment placed into effect in all material aspects the injunctive relief plaintiffs seek in their complaint. It is undisputed that this case concerns the same overcharges alleged in *Chakhalyan*. In the second amended complaint, plaintiffs demand injunctive relief that would require the City to cease improperly charging the solid resource fee, reimburse all improperly obtained fees, and authorize the court to maintain jurisdiction over the case and any injunction issued until the court, in its discretion, determines to dissolve and dismiss the injunction.

Pursuant to the *Chakhalyan* settlement and judgment which incorporated its terms, the City is to alter its billing system, policies and practices so the overcharges cease and do not recur and promptly and fully reimburse any persons who pay future overcharges. The court is to retain jurisdiction for purposes of enforcing the settlement, which includes the injunctive relief provisions. This is exactly the injunctive relief plaintiffs seek in their second amended complaint.

As we understand their argument, plaintiffs assert their demand for declaratory relief would require additional measures, such as an order that "class counsel be charged with retaining, at Defendants' expense, an accountant to review" data regarding the amount of fees charged to each class member and payments made, and that the accountant determine the amount owed to each class member. The declaratory relief demand also seeks an order that the City pay the amount owed to all class members

16

into a fund to be distributed to class members by the court, and that the court oversee the disbursement of funds to the class.

We disagree that these additional measures render the demand for injunctive relief materially different from the *Chakhalyan* provisions, such that plaintiffs' claims are not moot. Plaintiffs suggest in their briefing on appeal that their complaint seeks ongoing independent reporting or auditing of the City with respect to future conduct. But their actual complaint demands reporting and auditing related only to the calculation and distribution of funds to the class identified in the complaint. This speaks to administration of an award, but not a remedy for the essential harm alleged in the complaint: the City's act of unlawfully charging the solid resource fee. This remedy was addressed in *Chakhalyan* with the injunctive relief provision requiring the City to stop overcharging customers and to reimburse those overcharged—the same remedy plaintiffs demand in their own injunctive relief request.

The *Chakhalyan* settlement and judgment has already put into place the injunctive relief plaintiffs seek as a remedy for the harms alleged in their complaint. (See e.g., *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 660-662 [previously entered consent decree addressed the conduct raised in plaintiff's complaint, rendering prayer for relief effectively moot; class certification not appropriate where policies of disgorgement and deterrence had been vindicated in other proceedings]; *Chen v. Allstate Ins. Co.* (2016) 819 F.3d 1136, 1142 [plaintiff had received complete relief on individual claims; plaintiff gave no reason to believe that defendant's consent to injunctive relief would be inadequate or that plaintiff could obtain broader relief after trial on the merits].)

17

### iii. The *Chakhalyan* injunctive relief provisions bind the City and are prospective

Plaintiffs contend that although the *Chakhalyan* settlement and judgment provides that the trial court will retain continuing jurisdiction pursuant to Code of Civil Procedure section 664.6 (Section 664.6), this applies only to the parties to the *Chakhalyan* action and they were not "parties" under the terms of the stipulated settlement. As we understand this argument, plaintiffs assert the *Chakhalyan* court had no jurisdiction over them. This contention does not advance plaintiffs' ultimate claim. It is undisputed that the *City* was a party to the *Chakhalyan* settlement. As such, the City was, and continues to be, subject to the *Chakhalyan* judgment. The court has express continuing jurisdiction over the City as a party, with respect to the stipulated settlement and judgment. Any uncertainty regarding who may, or who will, seek to enforce the settlement and judgment against the City does not mean the City is free to abandon the obligations to which it stipulated and the court approved.

Under Section 664.6, the trial court has continuing jurisdiction to enforce the judgment, which incorporates the stipulated settlement, against the City. (*Lofton v. Wells Fargo Home Mortgage* (2014) 230 Cal.App.4th 1050, 1061 [retention of jurisdiction under Section 664.6 includes jurisdiction over both the parties and the case itself; it is broader than what typically remains following entry of a judgment; and it includes the court's equitable authority].) The settlement includes the injunctive relief provisions. Plaintiffs fail to offer any argument to explain their assertion that continuing jurisdiction to enforce the

*Chakhalyan* settlement would not include the terms regarding injunctive relief.

Moreover, plaintiffs' argument that the court had no jurisdiction to "enforce the stipulated injunction with respect to post-class period claims" is inconsistent with the actual language of the stipulated injunctive relief. In the agreement, the City is bound to monitor its systems to ensure that the overcharges *do not recur*, and in the event it identifies *future* overcharges through such monitoring, it is to promptly and fully reimburse the charges.

It would be absurd to read this language as applying only to claims the City had already been made aware of and would reimburse through other provisions in the agreement. (*Mount Vernon Fire Ins. Co. v. Busby* (2013) 219 Cal.App.4th 876, 882 [contract interpretation requires a commonsense interpretation which avoids absurd results]; *In re Tobacco Cases I* (2011) 193 Cal.App.4th 1591, 1601 [in enforcement actions consent decrees are treated as contracts for purposes of interpretation].) The stipulated settlement is explicitly prospective, intended to provide relief should *future* overcharges occur.

To the extent plaintiffs contend the injunctive relief provision only required the City to stop overcharging *Chakhalyan* class members, or only to reimburse future overcharges assessed to *Chakhalyan* class members, we reject the argument. The injunctive relief provisions contain no such limiting language, whereas other portions of the stipulated settlement identify "class members" explicitly. Further, the provision regarding reimbursement of future overcharges refers to those assessed to "any persons so identified," a term distinct from "class members." We therefore disagree that the settlement and judgment may be

19

construed as requiring the City to only reimburse future overcharges if they are imposed on *Chakhalyan* class members.

### iv. Plaintiffs have not shown their claims are not moot because they have a continuing economic interest based on shifting costs and fees to a class

Finally, we reject plaintiffs' argument that even though they received complete relief before they filed their complaint, they continued to have a stake in the litigation because of their interest in shifting part of the litigation costs and attorney fees to other class members.

Cases that have endorsed this theory have done so in a context in which the defendant satisfies the plaintiff's claim after the plaintiff has filed suit, and often after the plaintiff has engaged in significant litigation. In the seminal case on this issue, *Roper,* the plaintiffs litigated the case through an unsuccessful motion for class certification, filed a motion for an interlocutory appeal, and only then did the defendant present an offer of judgment. (*Roper, supra,* 445 U.S. at pp. 328-329.) Under these circumstances, the court noted the plaintiffs claimed a continuing economic interest in shifting the costs of litigation to other class members. (*Id.* at p. 334, fn. 6.) This interest was one basis for the conclusion that the plaintiffs had a personal stake in the appeal of the lower court's denial of their motion for class certification.[8]

---

[8]  Plaintiffs cite *Watkins* at length, but *Watkins* discussed *Roper* and found the reasoning inapplicable in that case. In *Watkins*, the court concluded the plaintiff did not have standing to represent a class because she had voluntarily settled her claims. (*Watkins, supra,* 172 Cal.App.4th at p. 1592; *Larner,*

20

Subsequent cases call into question the continuing validity of the *Roper* analysis on this point. In *Lewis v. Continental Bank Corp.* (1990) 494 U.S. 472, 480 (Lewis), the high court reasoned an "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim, see *Diamond v. Charles* [(1986)] 476 U.S. 54, 70-71 [(*Diamond*)]. Where on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary judicial pronouncements on even constitutional issues obtained, solely in order to obtain reimbursement of sunk costs." (*Lewis, supra,* at p. 480; *Genesis Healthcare Corp. v. Symczyk* (2013) __ U.S. ___, 133 S.Ct. 1523, 1532 [noting the court would not decide whether *Roper*'s analysis is still valid in light of *Lewis*].)

In *Premium Plus Partners v. Goldman, Sachs & Co.* (7th Cir. 2011) 648 F.3d 533 (*Premium Plus*), the Seventh Circuit Court of Appeals applied *Lewis* in a putative class action context. After the district court twice denied class certification, the representative plaintiff accepted an offer pursuant to Federal Rule of Civil Procedure 68 (Rule 68), but also sought to continue litigating the action in order to have a class certified. (*Premium Plus,* at p. 535.) The plaintiff argued its claim was not fully resolved "because if the class litigates, and wins, some of the expenses that Premium Plus has incurred along the way could be allocated to the class, and its net recovery therefore would be

_____

*supra,* 168 Cal.App.4th at pp. 1302-1304 [after voluntary settlement plaintiff retained no continuing interest in litigation; plaintiff did not assert she had reserved a right to shift attorney's fees to class member, thus her appeal was moot].)

21

larger. The logical implication of this position is that a person whose claim is moot still can file suit seeking attorneys' fees." (*Id.* at p. 538.)

The *Premium Plus* court disagreed: "That position was advanced, and flopped, in *Diamond,* [*supra*, 476 U.S. at pp. 70-71], and again in *Lewis,* [*svpra,* 494 U.S. at p. 480]; it fares no better when advanced by a would-be class representative. The Court said flatly in *Lewis* that an 'interest in attorney's fees is . . . insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim'; that's equally true of costs and the other expenses that Premium Plus hopes to offload to the class." (*Premium Plus, supra,* 648 F.3d at p. 538.)

Although in *Premium Plus* the plaintiff accepted an offer of judgment, we find the court's reasoning persuasive here, in that plaintiffs' claims are equally moot. In addition, we are aware of no legal authority supporting the proposition that a plaintiff whose claims are fully satisfied *before the plaintiff files a complaint* has a continuing economic interest in shifting attorney fees and costs to others that is sufficient to constitute the personal stake in the litigation required to avoid a finding of mootness.[9] *Roper* did not consider such facts. (See *Steel Co. v.*

---

[9] We further note the absence of any factual record indicating plaintiffs have actually incurred significant fees or costs prior to the City's reimbursement of the overcharges they paid. In opposition to the motion for summary judgment, plaintiffs declared only that they had retained counsel and were therefore "contractually obligated to pay costs and attorneys' fees." They did not offer evidence indicating they have actually incurred or paid any such costs or fees. (See *Roper, supra,* 445

22

*Citizens for a Better Environment* (1998) 523 U.S. 83, 107 "[A] plaintiff cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself."].)

The monetary relief the City provided to the plaintiffs, and the injunctive relief it agreed to in the *Chakhalyan* stipulated settlement and judgment, resulted in plaintiffs directly and indirectly receiving what they demanded in their suit, *before* they filed the second amended complaint that marked their formal involvement in the litigation. There was no further relief to be afforded the plaintiffs on their individual claims. (See *Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1503 [case is moot when a court ruling can have no practical impact or cannot provide the parties with effective relief]; *Chen v. Allstate Ins. Co., supra,* 819 F.3d at p. 1144 [interpreting *Campbell-Ewald Co. v. Gomez* (2016) __ U.S. ___, 136 S.Ct. 663 (*Campbell-Ewald*), "a lawsuit—or an individual claim—becomes moot when a plaintiff *actually receives* all of the relief he or she could receive on the claim through further litigation"].)

---

U.S. at p. 334, fn. 6 ["respondents have asserted as their personal stake in the appeal their desire to shift to successful class litigants a portion of those fees and expenses that have been incurred in this litigation and for which they assert a continuing obligation"]; *Bais Yakov of Spring Valley v. ACT, Inc.* (1st Cir. 2015) 798 F.3d 46, 49-50 [noting *Roper*'s "uncertain future" and unclear applicability; record did not disclose terms of plaintiff's agreement with counsel, thus court did not know if amount plaintiff had to pay attorneys would be less if class achieved a recovery, or what fees, if any, plaintiff would be required to pay if litigation ended at pre-certification stage].)

23

## II.    The Trial Court Properly Rejected the Pick Off Exception to Mootness in this Case

Plaintiffs argue that even if their individual claims are moot, they raised a triable issue of fact as to whether the "pick off" exception to mootness in class action cases should be applied here.  We conclude the exception does not apply to this case.

### A.  The "Pick Off" Exception

Courts have been extremely skeptical of defense efforts to take unilateral actions that moot a representative plaintiff's claims in an attempt to avoid litigating class claims.  However, these cases involve a defendant's *voluntary* actions, most concern such actions taken *after* the named plaintiff has filed a complaint, and they address the defense attempt to provide a remedy to the named plaintiff alone, rather than to the entire class.

For example, in *La Sala, supra,* 5 Cal.3d 864, the plaintiffs brought a class action against a savings and loan association, challenging a provision in the association's trust deed that permitted it to accelerate if the borrower executed a junior encumbrance on the secured property.  (*Id.* at p. 868.)  After the plaintiffs filed their complaint, but before the hearing on a demurrer, the defendant offered to waive its right to accelerate against the named plaintiffs.  On its own motion, the trial court ruled there was "no justiciable issue"; the court later dismissed the case, ruling there was no individual plaintiff remaining who was or could be construed to be a representative of the class. (*Id.* at p. 870.)

The California Supreme Court reversed the decision, concluding the defendant's offer to provide relief to the plaintiffs did not necessarily make them unfit to continue representing the class. (*La Sala*, *supra*, 5 Cal.3d at p. 871.)  The court reasoned:

"When a plaintiff sues on behalf of a class, he assumes a fiduciary obligation to the members of the class, surrendering any right to compromise the group action in return for individual gain. Even if the named plaintiff receives all the benefits that he seeks in the complaint, such success does not divest him of the duty to continue the action for the benefit of others similarly situated." (*Id.* at p. 871.)

The *La Sala* court further concluded that even if the trial court found the plaintiffs were no longer suitable representatives and, after having a chance to amend the complaint, no suitable representative was named, the court was required to notify the class of the proposed dismissal. The court explained any other resolution would allow the defendant to repeatedly offer relief to the named class representative, then have the case dismissed. "Such a procedure could be followed ad infinitum for each successive group of representative plaintiffs. If defendant is permitted to succeed with such revolving door tactics, only members of the class who can afford to initiate or join litigation will obtain redress; relief for even a portion of the class would compel innumerable appearances by individual plaintiffs. Yet the function of the class action is to avoid the imposition of such burdens upon the class and upon the court. [Citation.]. If we sanction [the defendant's] tactic defendants can always defeat a class action by the kind of special treatment accorded plaintiffs here and thus deprive other members of the class of the benefits of the litigation and any notice of opportunity to enter into it." (*La Sala, supra,* 5 Cal.3d at p. 873.)

We are mindful of the context of the *La Sala* court's reasoning. The plaintiffs had already filed their complaint when the defendant offered to provide the relief they demanded.

25

Their claims were not moot before the plaintiffs filed suit. The defendant offered to satisfy the named plaintiffs' claims, but it had not already done so. Its offer to resolve the claims was purely voluntary, rather than required by law or contract. Further, the offer to waive acceleration would apply only to the plaintiffs, not any other members of the class.

In *Kagan v. Gibraltar Sav. & Loan Assn.* (1984) 35 Cal.3d 582 (*Kagan*), disapproved of an another ground by *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 643, footnote 3, the California Supreme Court interpreted provisions of the Consumer Legal Remedies Act (CLRA) as specifically prohibiting a defendant from "picking off" prospective class representatives by offering them relief while not providing similar relief to the entire proposed class. (*Id.* at p. 587.) When the plaintiff in *Kagan* sent the defendant a demand letter challenging certain practices, including assessment of a particular fee, the defendant provided only a portion of the relief the plaintiff demanded. (*Id.* at pp. 589, 592.) The plaintiff subsequently filed a class action suit. (*Id.* at p. 589.)

The court concluded the defendant's attempted "pick off" was invalid under the CLRA and would not necessarily render the plaintiff unfit to represent a class and bring the action. There was no evidence the defendant complied with the statute's requirements that it identify similarly situated plaintiffs, notify other consumers that it would provide them similar relief, and provide relief to similarly situated consumers. (*Kagan,* at p. 592.) It remained in the discretion of the trial court to determine whether the plaintiff was a suitable representative for the class, in accord with *La Sala.* (*Kagan,* at pp. 595-596.)

Federal courts have similarly addressed the "pick off" exception, concluding when a defendant seeks to provide relief to the representative plaintiff in a strategic attempt to moot the plaintiff's claims and avoid a class action, the plaintiff may continue to prosecute the suit, at least to attempt to secure class certification.[10] (*Wilson v. Gordon* (6th Cir. 2016) 822 F.3d 934, 947-949.) Two United States Supreme Court cases considered whether a plaintiff whose claim was expired or satisfied could appeal an order denying class certification. In *Geraghty*, the named plaintiff challenged parole release guidelines on behalf of a class. He was paroled after his motion for class certification was denied and while his appeal of the ruling was pending. The court held he could still prosecute the appeal, despite the expiration of his individual claim. (*Geraghty, supra,* 388 U.S. at pp. 405-407.)

In *Roper*, the high court held that when, after the denial of class certification, a defendant made an offer of judgment for the maximum amount each plaintiff could have recovered in the litigation, and the court entered judgment over the objection of the plaintiffs, the plaintiffs could still appeal the denial of class certification. (*Roper, supra,* 445 U.S. at pp. 329-330, 340.)

Most recently, in *Campbell-Ewald, supra,* 136 S.Ct. 663, the high court concluded an unaccepted settlement offer or offer of judgment under Rule 68 does not moot a named plaintiff's claims. (*Campbell-Ewald,* at p. 672.) However, the court did not decide "whether the result would be different if a defendant deposits the full amount of the plaintiff's individual claim in an

---

[10] California courts may look to federal law when seeking guidance on issues of class action procedure. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 318.)

account payable to the plaintiff, and the court then enters judgment for the plaintiff in that amount." (*Ibid.*)

### i. The *Chakhalyan* stipulated settlement and judgment distinguishes this case

The critical factor that distinguishes this case from prior authorities on "pick off" is the existence of the *Chakhalyan* judgment. Pursuant to that judgment, the City had a legal obligation to reimburse plaintiffs for the solid resource fee overcharges they had paid. Moreover, that legal obligation applied equally to any other persons subjected to solid resource fee overcharges.

Plaintiffs point out the *Chakhalyan* judgment requires the City to "routinely monitor its billing system, policies and practice," and "in the event [the City] identifies future [solid resource fee] Overcharges through such monitoring, the City will promptly and fully reimburse any persons so identified . . . ." Plaintiffs argue the City did not identify them as persons subjected to overcharges through such routine monitoring, rather, the City discovered plaintiffs because of their anticipated involvement in the *Cunningham* litigation.

The *Chakhalyan* settlement and judgment do not define "routinely monitor" or specify exactly what form such monitoring will take. Further, while the measures identified in Exhibit G include items that would appear to be or would facilitate "routine monitoring," the City offered no evidence establishing it learned of the plaintiffs through any specific measures identified in that exhibit. However, we do not narrowly interpret the *Chakhalyan* settlement and judgment as requiring the City to reimburse solid resource fee overcharges only when it discovers overcharges through the City's internal measures.

28

The settlement's express purpose is to halt the overcharges, ensure they cease, and compensate those overcharged at the time of the settlement and in the future. To deem credits made to individuals the City discovers through threats of litigation to be purely voluntary, and outside the scope of the *Chakhalyan* settlement's injunctive relief provision, would be entirely inconsistent with the stated objectives of the stipulation. We can only understand the stipulated settlement as a whole by interpreting "persons identified" through "such monitoring" as broad enough to include persons who threaten litigation or otherwise become known to the City through some form of adversarial process.

Pursuant to the *Chakhalyan* judgment, the City has a legal obligation to reimburse DWP customers against whom it has improperly assessed solid resource fee overcharges. By crediting the plaintiffs' accounts, the City was complying with the obligations it agreed to in the resolution of *Chakhalyan*. The evidence further established it had done so for 852 other DWP customers between January and June 2013. In *La Sala*, the defendant offered to provide relief only to the representative plaintiffs. Any other putative class members would have no recourse except to file their own suits. The same was true in *Kagan*. In contrast, here, the *Chakhalyan* judgment created a remedy for the harm alleged in plaintiffs' complaint, and the City has afforded that remedy to plaintiffs and many others.

The policy concerns underlying the pick off exception are the desire to avoid "revolving door" litigation, whereby the defendant uses a tactic to avoid a class action, to the detriment of putative class members who cannot afford to initiate or join litigation, and inviting a waste of judicial resources. (*Roper,*

29

*supra,* 445 U.S. at p. 339; *La Sala, supra,* 5 Cal.3d at p. 873.) Here, the circumstances paint a very different picture. While this suit was pending with its original plaintiff, another previously-filed class action suit alleging identical claims was pending and was resolved. The resolution of *Chakhalyan* led to a binding judgment affording prospective relief for future claimants. Consistent with this judgment, the City provided plaintiffs complete relief, less than a year after the court entered judgment in *Chakhalyan*.

Pursuant to that same judgment, the City must provide the same relief to any other overcharged person – the remedy was not limited to plaintiffs alone. It did so 854 times between January and June 2013. There is no evidence or basis to infer that, with the arguable exception of plaintiffs, the other 852 reimbursements the City made were in response to actual or threatened litigation. Applying the pick off exception to mootness here does not address the policy concerns underlying the exception in the way it did in *La Sala, Kagan, Geraghty,* or *Roper.* (See *Cruz v. Farquharson* (1st Cir. 2001) 252 F.3d 530, 533, 535-536 (*Cruz*) [after plaintiffs filed suit based on agency delay in reviewing residency petitions, agency processed the petitions, then sought dismissal of the complaint as moot; court found plaintiffs had received complete relief, case was moot, plaintiffs did not establish that agency had pattern of delaying review until subjected to suit]; *Sze v. I.N.S.* (9th Cir. 1998) 153 F.3d 1005, 1008-1010.)

*Wallace v. GEICO General Ins. Co.* (2010) 183 Cal.App.4th 1390 (*Wallace*), offers a helpful contrast. In *Wallace*, the plaintiff filed a class action suit against GEICO, alleging the insurance company wrongly denied coverage for body shop repairs it

considered to be above prevailing labor rates. Several months before the plaintiff filed her complaint, GEICO entered into a stipulation and consent order with the California Department of Insurance regarding the company's refusal to reimburse labor rates above what it deemed the prevailing rate. (*Id.* at p. 1394.) Pursuant to the consent order, GEICO was ordered to cease and desist from violating certain Insurance Code provisions and regulations. It also agreed to conduct an internal audit of complaints it had received regarding labor rates to identify and reimburse insureds or claimants who had been subjected to GEICO's refusal to reimburse at full rates. The consent order required GEICO to reimburse affected insureds or claimants who complained during a 60-day period set forth in the order. (*Ibid.*)

Two months after the plaintiff filed her lawsuit, GEICO sent her a check reimbursing her in the amount she had paid out of pocket to repair her vehicle. A letter accompanying the check indicated GEICO made the payment in accordance with the consent order. (*Id.* at p. 1395.) GEICO then sought summary judgment, arguing the plaintiff's individual claims were moot and she lacked standing to pursue her class claims. The trial court concluded the plaintiff did not have standing to serve as a class representative. When the plaintiff failed to proffer a new class representative the court struck the class allegations. (*Id.* at p. 1396.)

On appeal, the plaintiff argued the "pick off" exception should be applied to allow her to continue as a representative plaintiff for a class. (*Wallace, supra,* 183 Cal.App.4th at pp. 1396-1397.) In response, GEICO argued it did not "pick off" the plaintiff by offering her individual compensation after she filed her suit. The company maintained it paid her pursuant to the

consent order with the Department of Insurance, to which it had agreed before the plaintiff filed her suit. GEICO further contended the policy underlying the pick off cases did not apply because, given the consent order, there was no risk that satisfying the plaintiff's claim would frustrate the objectives of class actions or open a revolving door of litigation.

The reviewing court rejected this argument based on its interpretation of the consent order. The court concluded the order was narrow and required GEICO to reimburse only a limited group of individuals that did not include the plaintiff. The court reasoned there might be other persons in the proposed class who would not be entitled to reimbursement under the terms of the consent order. (*Wallace,* at p. 1403.) As a result, the "pick off" exception was applicable: "Because GEICO was not required to reimburse [the plaintiff] under the terms of the consent order, it *voluntarily* offered to settle with her *after* she filed a class action lawsuit. The pickoff cases establish that in such a situation, [the plaintiff] does not automatically lose standing to act as a representative plaintiff." (*Id.* at p. 1403.) Issues of whether the plaintiff could adequately represent the class, and whether there was a class to represent given the consent order, were to be resolved in connection with class certification proceedings. (*Wallace,* at p. 1403, fn. 11.)

*Wallace* highlights the critical distinguishing factors in this case. The *Chakhalyan* settlement and corresponding judgment is not as narrow as the consent order in *Wallace.* Unlike the defendant in *Wallace*, the City had an obligation to reimburse the plaintiffs once it discovered they had improperly been charged the solid resource fee. The reimbursements were not a voluntary, gratuitous payment whose only purpose was to avoid class action

32

litigation. Further, by the time the second amended complaint was filed, the City had already reimbursed the plaintiffs for the overcharges and the *Chakhalyan* injunction was already in effect. This case is therefore unlike *Wallace*.

This case also differs from *Kagan*, in which the plaintiff was not necessarily rendered unfit to represent a class despite the defendant's provision of relief to her before she filed her complaint. In *Kagan*, the pre-filing remedy the defendant offered the plaintiff did not moot her claims because of the express statutory framework at issue and the defendant's failure to provide all of the relief the plaintiff demanded, including class-wide relief. Even under the specific CLRA framework at issue, the *Kagan* court agreed "that a consumer who has notified a prospective defendant of an individual grievance and has obtained his or her requested relief cannot subsequently bring either an individual or class action under the Act. However, this is not simply because the consumer no longer 'suffers any damage' but because the prospective defendant has remedied the contested practices. Similarly, a prospective defendant receiving notice of a grievance which affects a class of consumers can avert a subsequent class action only by remedying the contested practices as to all affected consumers." (*Kagan, supra,* 35 Cal.3d at p. 591.)

We thus disagree with plaintiffs' contention that evidence of a defense motive to avoid class litigation is the touchstone of the pick off exception. The critical issues are whether the defendant's actions are voluntary, rather than compulsory, and whether the relief provided is to the plaintiff alone or to the entire class the plaintiff seeks to represent. Here, before plaintiffs' second amended complaint was filed—their first formal

entry into the litigation as parties—the *Chakhalyan* judgment had created a mandatory remedy that applied to plaintiffs and others, and with which the City complied by reimbursing plaintiffs and others.  (See e.g., *Renne v. Geary* (1991) 501 U.S. 312, 320 ["[T]he mootness exception for disputes capable of repetition yet evading review . . . will not revive a dispute which became moot before the action commenced."].)

**III.  Conclusion**

The unique circumstances of this case dictate the result. The litigation was originally contemporaneous with *Chakhalyan*. Cunningham's claims were dismissed not because he was picked off, but because he was a member of the *Chakhalyan* class and he did not object to or exclude himself from the class.  The *Chakhalyan* stipulated settlement and judgment bound the City to provide relief to future persons improperly charged the solid resource fee.

In this context, the pick off exception to mootness does not fit.  Simply put, the City did what it was supposed to do under the *Chakhalyan* settlement: it reimbursed the plaintiffs for the improperly charged and paid fees.  Plaintiffs' claims are moot. The benefits afforded to the plaintiffs were similarly afforded to 852 other people between January and June 2013.  There is no basis to conclude the pick off exception should be applied to prevent the City from depriving other potential members of the class of the benefits of the litigation.  The benefits plaintiffs received resulted from the *Chakhalyan* litigation and they are equally available to any other potential members of the putative class plaintiffs seek to represent.

Plaintiffs assert that if they are not allowed to continue representing a class in prosecuting the claims alleged in their complaint, the City will persist in unlawfully charging the solid resource fee. They contend the City should not be allowed to avoid a class action suit into the indefinite future on the basis of the *Chakhalyan* settlement, simply by paying off every new plaintiff who appears.

We do not decide how a future court should characterize a new complaint, initiated after *Chakhalyan*, in which a plaintiff asserts harm in the form of an unlawful solid resource fee overcharge. Several years have passed since the *Chakhalyan* judgment was entered. A court may reasonably view a new claim of solid resource fee overcharges in a different light than the claims in plaintiffs' complaint. Whether a City reimbursement of a hypothetical future claim should be characterized as a "pick off" so that the plaintiff may continue prosecuting class claims is an issue that must be decided on its own merits, should it arise.

The plaintiffs before us have no further personal stake in the litigation. A court can award them no further remedy beyond what they have already received. Pursuant to the *Chakhalyan* judgment, the City must provide the same remedy to other putative class members; there is evidence that it has done so. There is no indication that the City has established a pattern of waiting until a customer sues or threatens to sue before it complies with the *Chakhalyan* obligations. (Compare *Cruz, supra,* 252 F.3d at p. 535 ["One swallow does not a summer make. . . . ."] and *Demmler v. ACH Food Companies, Inc.* (D. Mass. 2016) 2016 WL 4703875, *8 [summary judgment granted where plaintiff had received full relief; rejecting pick off argument, noting no evidence that defendants had a pattern of

35

tendering full relief to plaintiffs before certification] with *Dozier v. Haveman* (E.D. Mich. 2014) 2014 WL 5483008, *6, 13 [applying pick off theory where defendant had mooted three sets of representative plaintiffs; court found it significant that there appeared to be no shortage of class members willing to intervene].)

Applying the "pick off" exception to mootness under these circumstances would not advance the policies underlying the exception: avoiding the frustration of the objectives of class actions and preventing the waste of resources that would occur with successive suits claiming similar injuries. (*Roper, supra,* 445 U.S. at p. 339.)

The trial court properly granted summary judgment on the ground that plaintiffs' claims are moot.

## DISPOSITION

The trial court judgment is affirmed. Respondent is to recover its costs on appeal.

**CERTIFIED FOR PUBLICATION**

BIGELOW, P.J.

We concur:

RUBIN, J.

FLIER, J.